# Supreme Court of Texas

No. 23-0968

In the Interest of G.A.M., a Child

On Petition for Review from the
Court of Appeals for the First District of Texas

JUSTICE YOUNG, joined by Justice Devine, Justice Blacklock, and Justice Busby, concurring in the denial of the petition for review.

This sad petition comes from a parent who unquestionably loves and wants to care for her baby but who "has a mental or emotional illness or a mental deficiency that renders the parent unable to provide for the physical, emotional, and mental needs of the child." Tex. Fam. Code § 161.003(a)(1). The Texas Department of Family and Protective Services sought and was granted termination of the parental rights of O.T.F.C., whom I call Mother, under § 161.003 and § 161.001(b)(1)(O), (b)(2). The court of appeals affirmed.

I concur in denying Mother's petition for review. Factually, this case reduces to two points: (1) Mother's cognitive difficulties amount, as she concedes, to some form of mental impairment that renders her unable to independently parent her child; and (2) despite Mother's impairment, everyone agrees that she genuinely loves her daughter. I write separately because I cannot help but wonder whether our law can find a solution

short of termination—the worst sanction a parent can receive, one we properly call the death penalty of civil cases—when a loving parent's chief flaw is, to quote the statute, a "mental deficiency" over which she has no control.

**I**

Mother suffers from "cognitive delays." She was 22 at the time of trial in March 2023, but her reading, writing, and math skills were at a kindergartner's level. Her verbal comprehension, perceptual reasoning, working memory, and overall cognitive ability scored "Extremely Low" during a psychological examination. The clinical psychologist who performed the exam reported that Mother had significant communication, health and safety, and academic deficiencies. The psychologist testified that, because of these problems, Mother may not "understand developmental needs of the child or may not know how to respond in novel situations with her child." A wealth of evidence shows this concern to be well-founded—never a lack of love, but frequently a lack of capability.

The leading theory behind Mother's cognitive delays relates to a tragic head injury she sustained in early childhood. When she was just four, Mother's "[eight]-year-old cousin pushed her off the 2nd floor of the family residence in Mexico." Mother fell headfirst. She was hospitalized for two days and underwent surgery.

Whatever its cause, the deficiency renders Mother unable to independently parent G.A.M., whom I call Daughter. Mother was 21 when Daughter was born on December 24, 2021. The father's identity is unsubstantiated, and Mother lacks any contact information for him.

Nearly three months after Daughter's birth, the Department started investigating Mother when it learned that Daughter was severely underweight. There was concern that Mother forgot to feed Daughter; Mother's family members were calling to "remind her to feed the baby."

When feeding Daughter, Mother struggled "measuring the amount of formula to go into the bottle." She also struggled changing Daughter's diaper. On one occasion, she was unable to change the diaper without help, and the "baby's genital area was inflamed with a diaper rash, and [Mother] did not know to treat the baby's rash with diaper cream on the baby while changing her." Mother and Daughter lived in a home where "[e]vidence of human or animal waste was found throughout [the] living quarters." Daughter was sometimes left unattended, and she needed medical treatment for torticollis and plagiocephaly.*

Daughter was eventually removed from Mother and placed with foster parents. At trial, the foster mother described the child's dire condition upon her arrival into their family:

> [Daughter] was exhausted. . . . She had a hard time being lively enough to take, like, a 2-ounce bottle at a time. She was pretty grimy and dirty. She had a lot of dirt under her fingernails, which were long and not clipped. She had cradle cap, and it looked like it hadn't really been combed or shampooed because her hair was kind of glued to her head. And then pretty quickly, and for probably the first

---

* "Plagiocephaly" is "an asymmetric craniostenosis due to premature closure of the lambdoid and coronal sutures on one side; characterized by an oblique deformity of the skull." *Plagiocephaly*, Stedman's Medical Dictionary (5th unabridged lawyers ed. 1982). "Torticollis" refers to "stiffneck; a contraction, often spasmodic, of the muscles of the neck, chiefly those supplied by the spinal accessory nerve; the head is drawn to one side and usually rotated so that the chin points to the other side." *Torticollis*, Stedman's Medical Dictionary (5th unabridged lawyers ed. 1982).

3

week, we found debris in her stools. That was concerning. . . . [T]here would be a clump in the stool and it—you know, one time—it very clearly came from either a stuffed animal or a blanket, something fuzzy, like poly-fiber, something like that.

Joining the foster home gave Daughter new life. She gained weight and began meeting developmental milestones. The foster parents arranged successful medical treatment for Daughter's torticollis and plagiocephaly, including helmet therapy. Pictures show Daughter growing up happy and healthy—smiling on a swing set, being held by her foster mother at a zoo, playing on a piano with her foster father and sister. Daughter "attends baby gymnastics once a week." She has toys in her own bedroom, which appears clean and welcoming. Daughter has bonded with the foster parents, who are willing to adopt her and care for her. They have stated a firm intention to allow Daughter a supervised relationship with Mother. Foster parents like these take the initiative to positively transform a child's life; they warrant the deepest gratitude from our State and its citizens. The prospect of these particular parents adopting seems like a very good outcome for Daughter.

But what about Mother? Despite the problems that I have described, everyone agrees that she loves Daughter. At trial, she opposed adoption and pleaded for Daughter's return: "[S]he is my baby. My baby. . . . Please my baby come home." She repeatedly stated to the clinical psychologist conducting her psychological exam that she would do whatever it would take to get Daughter home. Mother also "expressed she wants her baby back several times at each visit" with a representative from Child Advocates. The foster mother testified that Mother "obviously" cares for Daughter a "great deal." The Department's

4

caseworker likewise indicated that Mother loves Daughter. Nothing in the record makes this point contestable at all, and the court of appeals specifically noted that "[i]t was not disputed that Mother loves [Daughter]." No. 01-23-00301-CV, 2023 WL 6393913, at *7 (Tex. App.— Houston [1st Dist.] Oct. 3, 2023).

Yet the Department successfully pursued termination of Mother's parental rights under § 161.003 and § 161.001(b)(1)(O), (b)(2). Mother appealed. She argued that termination was not in Daughter's best interest under § 161.001(b)(2). 2023 WL 6393913, at *1. The court of appeals overruled her argument and affirmed. *Id.* at *8. Mother petitioned this Court for review, where she raises the same sole issue.

**II**

Termination proceedings require two showings. First, "[t]o terminate parental rights, the Legislature requires the Department to establish by clear and convincing evidence at least one of the predicate findings under Family Code Section 161.001(b)(1)." *In re R.J.G.*, 681 S.W.3d 370, 377 (Tex. 2023); *see also* § 161.003(a)(1)–(4). Second, "regardless of which predicate it asserts to justify termination, the Department must also prove by clear and convincing evidence that termination is in the child's best interest." *R.J.G.*, 681 S.W.3d at 377; *see also* § 161.003(a)(5).

Because Mother only challenges the second showing, I agree with the Court's decision to deny her petition for review. Viewing the evidence summarized above (and discussed in the opinion below) in the light most favorable to the finding, *see In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018), the court of appeals properly concluded that a reasonable

5

fact finder could form a firm belief or conviction that terminating Mother's parental rights was in Daughter's best interest.

I write separately to discuss the first showing. Unlike the best-interest findings, the predicate findings focus on the parent. They promote a careful balance of the competing interests at stake: "the parents' fundamental interest in maintaining custody and control of their children is balanced against the State's fundamental interest in protecting the welfare of the child." *In re A.B.*, 437 S.W.3d 498, 505 (Tex. 2014) (referencing § 161.001). Through the predicates, the legislature "has safeguarded the parent's fundamental interest by limiting the circumstances in which the State's interest can overcome the parent's interest." *Id.* Although a child's best interest is paramount, a court cannot terminate a parent's rights to that child absent finding one or more predicates met. I take the predicates of § 161.001(b)(1)(O) and § 161.003(a)(1)–(4) in turn.

### A

"Section 161.001(b)(1) sets forth twenty-two predicate grounds for termination." *R.J.G.*, 681 S.W.3d at 377. They target various "acts or omissions" of the parent. *See A.C.*, 560 S.W.3d at 630. For example, termination may be proper where the parent "voluntarily left the child alone . . . and expressed an intent not to return," § 161.001(b)(1)(A), "knowingly allowed the child to remain in conditions or surroundings which endanger . . . the child," § 161.001(b)(1)(D), "engaged in conduct . . . which endangers . . . the child," § 161.001(b)(1)(E), "used a controlled substance . . . in a manner that endangered the health or safety of the child," § 161.001(b)(1)(P), or "knowingly engaged in criminal conduct,"

6

§ 161.001(b)(1)(Q).

The predicate in paragraph O is one of just two that "permit termination for violating a court order." *R.J.G.*, 681 S.W.3d at 378. Paragraph O allows termination where the child was initially removed from the parent due to "abuse or neglect," and the parent then "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child." § 161.001(b)(1)(O). Such court-ordered "service plans," as we call them, consist of "lengthy and detailed series of requirements designed to show that retaining the parent-child relationship remains in the child's best interest, including by demonstrating that the problems leading to the removal of the child have been remedied." *In re A.P.*, 672 S.W.3d 132, 133 (Tex. 2023) (Young, J., concurring in the denial of the petition for review).

People *should* obey court orders, especially if doing so is essential to the restoration of full parental rights. One reason for paragraph O's legitimacy as a basis for termination is that parents who *can* comply, yet refuse to do so, illustrate by that very refusal the kind of indifference (or worse) to their child that led to the child's removal in the first place. By the same token, however, paragraph O is problematic as a basis for termination when, as in this case, the Department alleges a parent's disabling mental deficiency. Such a parent's "fail[ure]" to comply with their service plan seems predestined, as the difficulty of complying with a court-ordered service plan is presumably greater for someone with massive cognitive difficulties. Given their length and detail, service plans "can be difficult—perhaps impossible—to comply with fully." *In re A.A.*, 670 S.W.3d 520, 531 (Tex. 2023). If that is true for anyone, it is especially

7

for someone like Mother, whose cognitive abilities are "extremely low" and at a "kindergartner's level." Expecting her to comply with the same kind of court order as someone without these problems seems fanciful.

But my concerns are at least assuaged in part. For one thing, even if the State continues to invoke paragraph O against such parents— because paragraph O is generally the easiest burden for the State to lift and appears to be part of nearly every parental-termination case—that invocation may well fail in cases like this one if it is challenged. A parent, after all, can withstand termination under paragraph O by proving that she was "unable to comply with specific provisions" of the service plan after having made a good-faith effort to comply. § 161.001(d). This provision provides at least some protection for mentally impaired parents. Mother, however, makes no argument on that ground. She received a service plan with a laundry list of requirements. She apparently "failed" to complete a required psychiatric evaluation and individual counseling. Mother's counsel contended at trial that Mother's service plan was not accommodated to reflect her mental disability. But no such contention is part of this appeal, although the extent to which Mother could understand and comply with her service plan is unclear.

"[O]ur judicial antennae are raised and attuned to potential misuses of (O)." *A.A.*, 670 S.W.3d at 531. While paragraph O provides no basis for reversing the court of appeals' decision in this case, my continued hope is that courts will approach paragraph O with *highly alert* antennae whenever that ground is invoked but seems to fit uneasily in a given case. *See id.* at 536, 543 (Young, J., dissenting). It seems obvious to me that paragraph O's invocation should be regarded with suspicion when

8

deployed against a parent with a mental deficiency that may obstruct her ability to comply with a service plan. There are *other* ways to protect children if a parent is incapable of caring for them—but resort to paragraph O is the least plausible one. A parent like Mother would typically fail to complete a service plan not because of contempt for the legal process or a lack of desire to achieve reunification, but simply because of objective inability.

**B**

One reason for skepticism of the overuse of paragraph O—but another basis for assuaging my concern—is that the Family Code makes it unnecessary to enlist it in contexts like this one. Section 161.003 is a distinctly codified termination provision that complements paragraph O, because if § 161.003's requirements are met, it authorizes termination even when a parent could not reasonably be held responsible for failing to comply with a service plan. This Court has cited § 161.003 just a handful of times. We have never, to my knowledge, applied its subsections to a particular case. Like § 161.001's termination provisions, § 161.003 authorizes termination when in the child's best interest. But as a predicate matter, the terminating court must find, among other things, that the parent suffers from a disabling mental deficiency or illness:

> (a) The court may order termination of the parent-child relationship in a suit filed by the Department of Family and Protective Services if the court finds that:
>
> > (1) the parent has a mental or emotional illness or a *mental deficiency* that renders the parent unable to provide for the physical, emotional, and mental needs of the child;
> >
> > (2) the illness or *deficiency*, in all reasonable

probability, proved by clear and convincing evidence, will continue to render the parent unable to provide for the child's needs until the 18th birthday of the child;

(3) the department has been the temporary or sole managing conservator of the child of the parent for at least six months preceding the date of the hearing on the termination held in accordance with Subsection (c);

(4) the department has made reasonable efforts to return the child to the parent; and

(5) the termination is in the best interest of the child.

§ 161.003 (emphasis added); *see also* § 161.003(b), (d) (requiring appointment of an attorney ad litem to represent the parent's interests during the proceeding, unless the parent retains another attorney).

Section 161.003(a)'s predicate findings are outliers compared to the "acts or omissions" of § 161.001(b)(1). "Most of the petitions for review this Court receives in parental-termination cases involve parents whose severe abuse or abandonment of their children, debilitating drug addiction, or violent and criminal behavior provide the clear and convincing evidence required for imposition of the draconian remedy of termination." *In re A.M.*, 630 S.W.3d 25, 26 (Tex. 2019) (Blacklock, J., concurring in the denial of the petition for review). Section 161.003, by contrast, permits termination without any moral condemnation of the parent—where the parent has a disabling condition attributable to circumstances *beyond the parent's control*. Such is the case for Mother, at least, whose cognitive delays appear attributable to the tragic two-story head-first fall she suffered in early childhood.

The closing argument from Daughter's ad litem attorney helps frame the § 161.003 analysis here: "We're not here to beat up on Mother

10

or to say that she hasn't tried. We're here to acknowledge that her cognitive disability impairs her ability to care for a child by herself." I do not take anyone involved in this case as disagreeing with those statements. But we also cannot sugarcoat what § 161.003 says in authorizing termination. Mother is deemed "deficient" or "ill," so much so that she is fundamentally "unable" to be a parent.

Such a demoralizing judgment by one's own government can lead to the gravest imaginable consequence. "Termination of parental rights, the total and irrevocable dissolution of the parent-child relationship, constitutes the 'death penalty' of civil cases." *In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring). It means ending Mother's "very status as Daughter's mother. In the eyes of the law, they would become strangers." *A.P.*, 672 S.W.3d at 133 (Young, J., concurring in the denial of the petition for review). At the very least, finding someone morally innocent yet medically unable to be a parent should be a judgment reached only as a last resort, just as any "death penalty" is a last resort.

I do not disagree that the record here satisfies these requirements under the standard of review that we currently employ. But I struggle coming to terms with the conclusion that, because of her disability, the only way to protect Daughter is that Mother must be permanently and legally estranged from her.

She loves Daughter; she appeared at trial and begged for Daughter's return. Mother is, by herself, surely "unable to provide for the physical, emotional, and mental needs" of Daughter. § 161.003(a)(1). And the record does not reflect that she has a family or other support

11

system who could help her provide for Daughter. Yet Mother has done nothing intentional to harm Daughter. What the law calls her "mental deficiency" leaves her unable to appreciate and attend to her child's essential needs. But by every indication, her deficiency arises from circumstances beyond her own making—this is not a self-inflicted termination case (drugs, violence, malice, etc.) of the sort that Texas courts so often confront. It is therefore harder to see how Mother's fundamental interest in being a parent to Daughter—and, indeed, Daughter's fundamental interest in the relationship with Mother, like any child's interest in a relationship with her own parents—was properly safeguarded.

Before she joined the bench of this Court, my predecessor, Justice Guzman, observed "the failure of Texas law to adequately address parental competency in the context of termination of parental rights." *In re E.L.T.*, 93 S.W.3d 372, 377 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (Guzman, J., concurring). She suggested that a parent has "a due process right to a parental competency hearing prior to a proceeding to terminate parental rights," something which the Family Code does not guarantee them. *Id.* "A competency hearing would provide the trial court with an opportunity to gain a better understanding of the parent's capabilities as well as to explore *alternative remedies.*" *Id.* at 380 (emphasis added).

Many courts of appeals have cited or discussed Justice Guzman's concurrence, although they do not necessarily agree that there is a problematic Family Code gap regarding parental competency. One case questioned whether a competency hearing was constitutionally required

12

if the parent already receives an ad litem attorney. *See In re J.P.-L.*, 592 S.W.3d 559, 586–87 (Tex. App.—Fort Worth 2019, pet. denied) ("But even a competency hearing, within the current statutory scheme, would appear to make little difference when compared to the child's best interest."); *see also* § 161.003(b). Another did not focus on competency hearings, but questioned how interjecting competency issues into a termination proceeding might unnecessarily prolong the case. *See In re R.M.T.*, 352 S.W.3d 12, 19, 23 (Tex. App.—Texarkana 2011, no pet.) (discussing Justice Guzman's concurrence and stating that delaying trial "until a return of competence would contravene the State's and the child's interest in a final decision so that the child's adoption or placement in a stable home or return to the parent is not unduly prolonged").

I do not commit myself to any position regarding these cases, and I do not contend that a competency hearing in *this* case would change the outcome. We are not presented with a constitutional question here, and it is otherwise presumably true that § 161.003 reflects the legislature's careful and proper policy choices, which I respect. Section 161.003 may have helped save Daughter's life, given her dire condition upon entry into the foster home. I do not wish to be misunderstood as suggesting that parents mentally or physically incapable of taking care of children should have custody and control of those children during the period of such disability (which may be permanent).

But I wonder whether our legal system could save Daughter, and offer her the bright future that her foster parents have made possible, short of *legally* estranging her from her loving Mother. I take comfort

13

in *this* foster family's expressed willingness to maintain a bond between Mother and Daughter, albeit not one with a formal legal status. Perhaps formalizing the State's obligation to ensure such access for other loving but disabled parents would be a way to bridge the gap—to protect children without destroying bonds with loving natural parents. This question may be one for legislative consideration. Justice Guzman's call for consideration of "alternative remedies" strikes me as well worth the effort.

\* \* \*

Denying Mother's petition for review means that Mother will officially cease to be Daughter's *mother*. This result is troubling, but I cannot see it as improper under current Texas law and the facts of this case. I therefore concur, even as I express my concern for the rights of all involved, with an eye toward future cases.

Evan A. Young
Justice

**OPINION FILED:** June 28, 2024